UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>FACEBOOK USER ID:<br><br>**100056934085069; also known as www.facebook.com/taurusmcdaniel1006**<br><br>**that is stored at premises controlled by Meta Platforms, Inc. and saved as Meta Platforms, Inc. case number 7794254** | Case No.  __6:23mj36__<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Daniel Bailey, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the user ID, including the content of the subscriber's or customer's account.

2. I am a Task Force Officer with the Drug Enforcement Administration (DEA) and have been since 2017. I am also a Detective with the Lynchburg Police Department (Virginia) and have been so employed since 2002. I am currently assigned to investigate drug trafficking

1

organizations as a member of the DEA, Washington Field Division/Roanoke Resident Office. My duties as a Task Force Officer involve the investigation of various criminal activities of narcotics traffickers and their associates. In investigating these matters, I have acted as a case agent, an undercover agent, and a contact agent for confidential sources. These investigations have resulted in the issuance of federal search warrants, seizure warrants, indictments, and convictions of persons for federal narcotics violations. During my employment as a law enforcement officer, I have received multiple hours of training in narcotics enforcement and investigative techniques, and I have personally participated in numerous investigations. I have also spoken on numerous occasions with informants, suspects, and other experienced narcotics traffickers concerning the methods and practices of drug traffickers, including the methods and practices used by traffickers of methamphetamine, heroin, and cocaine. I have been involved in the execution of numerous search warrants on accounts of social media platforms, including Meta Platforms LLC ("Facebook").

3. The facts in this affidavit come from my own investigation, observations, training and experience, and information obtained from other law enforcement officers and witnesses which I have found reliable. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that Taurus MCDANIEL ("MCDANIEL"), Quentin RANDOLPH ("RANDOLPH"), Markell MELLETTE ("MELLETTE") and others, are engaged in a conspiracy to violate federal drug laws, specifically: narcotics trafficking, in violation of 21 U.S.C. § 841(a); and offenses involving the use of communications facilities in commission of narcotic offenses, in violation of

21 U.S.C. § 843(b). There is also probable cause to believe that records held by Meta Platforms, LLC ("Facebook") pertaining to the account 100056934085069; also known as www.facebook.com/taurusmcdaniel1006 ("SUBJECT ACCOUNT"), described in Attachment A, contain evidence related to narcotics trafficking, in violation of 21 U.S.C. § 841(a); and offenses involving the use of communications facilities in commission of narcotic offenses, in violation of 21 U.S.C. § 843(b), described in Attachment B.

## PROBABLE CAUSE

5.  The United States, including Drug Enforcement Administration ("DEA") and the Lynchburg Police Department ("LPD"), is conducting a criminal investigation of Taurus MCDANIEL ("MCDANIEL"), Quentin RANDOLPH ("RANDOLPH"), Markell MELLETTE ("MELLETTE") and others regarding violations of distribution and possession with intent to distribute crystal methamphetamine and other controlled substances, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to distribute crystal methamphetamine, in violation of 21 U.S.C. § 846. Those violations are occurring, in part, in the Western District of Virginia

6.  MCDANIEL has been identified as a source of supply to multiple co-conspirators, in addition to others in the Lynchburg area, with distributable amounts of crystal methamphetamine. MCDANIEL's home residence was identified as 100 Bright Star Court, Lynchburg, Virginia.

7.  RANDOLPH has been identified as a source of supply to co-conspirators in the Lynchburg (Virginia) area with distributable amounts of crystal methamphetamine. MELLETTE has been identified as a source of supply to co-conspirators in the Lynchburg (Virginia) area with distributable amounts of crystal methamphetamine.

8. MELLETTE is a charged with conspiracy to distribute methamphetamine and cocaine, distribution of methamphetamine, and possession with the intent to distribute cocaine (Case Number 6:22-cr-22).

9. In September 2022, law enforcement executed a federal search warrant (622mj11) on a cellular device identified as being used by Markell MELLETTE to facilitate narcotic transactions. A search of the data extracted from the device determined that MELLETTE was exchanging text messages with cellular phone number 434-473-9051. That number was saved under the contact name of "Taurus Big Billy". This affiant knew "Billy" to be a term used to describe a rank of the BLOODS criminal gang. This affiant knew MCDANIEL and MELLETTE to be known members of the BLOODS criminal gang.

10. This affiant subpoenaed the carrier of 434-473-9051 for subscriber and toll record data associated with the number. Based on the provided data, law enforcement determined that the subscriber of the account was "Taurus MCDANIEL".

11. This affiant determined that MELLETTE was exchanging text messages with MCDANIEL (434-473-9051) between October 2021 and June 2022. Of the exchanged messages, MCDANIEL asked MELLETTE how much a "quarter p… (of) weed" was. MELLETTE requested "10 glizzys" (street slang for ten Glock pistols). MCDANIEL later sent MELLETTE two photographs of a semi-automatic pistol. MCDANIEL advised that the pistol would could "7" or a "zip" (ounce). MCDANIEL later sent a photograph of a semi-automatic pistols and advised that it would be "21 grams for u". MCDANIEL then sent a photograph of another semi-automatic pistol. MCDANIEL called it a "glizzy". MCDANIEL advised that the pistol was "going for a whole zip".

12. In/about January 2023, conducted an interview of a Confidential Source ("CS"). CS is an uncharged co-conspirator of this investigation. The CS provided information in hopes of receiving consideration on any potential sentence the CS may receive. The CS has provided information to law enforcement against the CS's own penal interest. The CS is a convicted felon, to include narcotic trafficking offenses. During that interview, the CS identified RANDOLPH as a source of supply for crystal methamphetamine.

13. On March 14, 2023, law enforcement met with the CS for the purpose of making a controlled methamphetamine purchase from RANDOLPH. During that controlled purchase, the CS communicated with RANDOLPH via cellular phone to further facilitate the transaction. RANDOLPH advised that "the man is waiting on us". The CS was searched before and after the transaction. Law enforcement did not locate any currency or contraband on the CS's person. During the controlled purchase, the CS provided RANDOLPH with currency to purchase methamphetamine. Law enforcement then followed RANDOLPH to 100 Bright Star Ct, Lynchburg Virginia.

14. During the course of the controlled purchase, law enforcement observed multiple vehicles parked on the curtilage of the residence. One of the vehicles was registered to MCDANIEL. RANDOLPH waited on the porch of the residence until a vehicle, also registered to MCDANIEL, arrived at the residence. MCDANIEL was observed exiting the vehicle and meeting with RANDOLPH. RANDOLPH then walked back to the CS and provided the CS with a crystalline substance consistent with crystal methamphetamine.

15. On March 21, 2023, law enforcement met with the CS to make a controlled phone call to RANDOLPH to order a quantity of crystal methamphetamine. During the course of the controlled call, the CS requested a lower price for the crystal methamphetamine. RANDOLPH

advised that he would have to make a phone call and would call the CS back. RANDOLPH called the CS back a short time later and agreed to reduce the price.

16. On March 22, 2023, law enforcement met the CS to conduct the controlled purchase discussed on March 21, 2023. During that controlled purchase, the CS communicated with RANDOLPH via cellular phone to further facilitate the transaction. The CS was searched before and after the transaction. Law enforcement did not locate any currency or contraband on the CS's person. During the controlled purchase, the CS provided RANDOLPH with currency to purchase methamphetamine. Law enforcement then followed RANDOLPH to 100 Bright Star Ct, Lynchburg Virginia.

17. During the controlled purchase, law enforcement observed a vehicle parked on the curtilage of the residence that was found to be registered to MCDANIEL. RANDOLPH was observed leaving the residence, meeting back the CS, and ultimately providing the CS with a crystalline substance that was consistent with crystal methamphetamine. Law enforcement then observed MCDANIEL leaving the residence.

18. On December 21, 2022, MCDANIEL was arrested by the Lynchburg Police Department on an active arrest warrant for Possessing a Firearm by a Convicted Felon. During the course of that arrest, a cellular phone was found on/about his person. On January 12, 2023, law enforcement obtained and executed a search warrant (6:23mj6) authorizing the extraction of the data contained on the device.

19. Law enforcement later analyzed the data a determined that the Facebook Messenger application had been installed onto the device. The account that was logged onto the application was found to be Facebook account number 100056934085069 ("SUBJECT ACCOUNT"), user name "Taurus McDaniel".

20. Law enforcement analyzed some of the messages exchanged on the SUBJECT ACCOUNT. Those messages included, but not limited to, MCDANIEL discussing the sale of a "M Ball" (with an ice cube emoji) and "hp of a M" with Co-Conspirator #1. Those messages were exchanged in December of 2022. This affiant knew "M" to be slang for methamphetamine. This affiant knew an ice cube emoji to be used as a symbol for methamphetamine.

21. Law enforcement also located messages exchanged on the SUBJECT ACCOUNT with Co-Conspirator #2 ("CC#2"). Those messages were exchanged in December of 2022. Those messages included, but not limited to, MCDANIEL receiving a video and a photograph from Co-Conspirator #2. That media was not able to be reviewed on the data extraction. MCDANIEL responded to the video stating, "I got that same joint, with the drum too, you don't got nothing else, hand joints??". This affiant believed, from training and experience, a "drum", in this context, referred to a drum-type magazine used for a rifle. This affiant believed, from training and experience, that "hand joints" were being referred to as hand guns. MCDANIEL later messaged CC#2 that MCDANIEL had an "AR for 500". This affiant knew, from training and experience, that "AR", in this context, referred to an AR-15 rifle.

22. Law enforcement conducted an open source search of the SUBJECT ACCOUNT and reviewed the data posted for public review. Law enforcement determined that the account was still active and that a "selfie" video of MCDANIEL had been uploaded to the SUBJECT ACCOUNT on April 26, 2023.

23. Further search of the open source data posted by the SUBJECT ACCOUNT revealed that on February 23, 2023, the SUBJECT ACCOUNT was "tagged" in post. That post included a photograph of a white Lexus sedan bearing Virginia tag 5675XJ. A query of that registration through Virginia Department of Motor Vehicles determined that MCDANIEL was

7

the registered owner of the vehicle. Furthermore, that vehicle was observed by law enforcement parked at MCDANIEL's residence during the course of a controlled methamphetamine purchase in March of 2023. Approximately forty-five minutes after the conclusion of the controlled purchase, MCDANIEL was observed leaving the residence in that vehicle.

24. On April 21, 2023, law enforcement submitted a preservation request to Facebook for all available data associated with the SUBJECT ACCOUNT

25. On May 5, 2023, law enforcement executed a federal search warrant (623mj22) on Facebook for the data associated with the SUBJECT ACCOUNT.

26. On June 2, 2023, law enforcement executed a federal search warrant (623mj25) authorizing the search of 100 Bright Star Court, Lynchburg Virginia. As described in this affidavit, law enforcement identified that location at the residence of MCDANIEL. A search of that residence yielded the seizure of approximately eight ounces of crystal methamphetamine and approximately fifteen ounces of cocaine. Based on this affiant's training and experience that amount of narcotics is not consistent with a "personal use" amount and is consistent with possessing an amount with the intent to distribute it.

27. On/about June 17, 2023, law enforcement received the requested data associated with the SUBJECT ACCOUNT. That data was labelled as Facebook case number 7794254.

28. Law enforcement began to analyze the data within the scope of the original search warrant (623mj22). During the course of that analysis, law enforcement located the exchange of messages between the SUBJECT ACCOUNT and other Facebook accounts, both known and unknown to this affiant, discussing and coordinating the distribution of Controlled Substances.

29. Law enforcement located, to include but not limited to, the following messages sent from the SUBJECT ACCOUNT:

    a. The SUBJECT ACCOUNT user advised "I'll give you a good deal. I'll triple your money. I don't front" This affiant knows that "front" is street slang for providing narcotics on consignment with promise of repayment on a later date.

    b. The SUBJECT ACCOUNT user requested "Bring me you bench.." because the SUBJECT ACCOUNT user could not find their "scales". This affiant knew "bench" and "scales" were referring to a digital scale, which are used to weigh narcotics.

    c. The SUBJECT ACCOUNT user advised they had just paid their "plug". "Plug" is a street slang term for a source of supply of narcotics.

    d. The SUBJECT ACCOUNT user advised that the user did not have a lot of "girl", but had a lot of "ice… crystal". The user advised that the "girl" was "moving" fast and the "ice" was "going slow". This affiant knew through training and experience that "girl" is street slang for cocaine and "ice… crystal" were street slang for methamphetamine. This affiant also knew "moving" and "going slow" were terms to describe the pace of sales of narcotics.

30. Accordingly, this search warrant seeks to search the same SUBJECT ACCOUNT as the warrant issued in 623mj22, but for the items listed in Attachment B.

31. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

32. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

33. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

34. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

35. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items

available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

36. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

37. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

38. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

39. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

40. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

41. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

42. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

43. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

44. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the

action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

45. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

46. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as

described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

47. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

48. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.

Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

49. Based on the foregoing, I request that the Court issue the proposed search warrant.

50. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Facebook. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

51. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

52. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

*s/Daniel Bailey*
Daniel Bailey, Task Force Officer

Drug Enforcement Administration

Received by reliable electronic means and sworn and attested to by telephone on this  5   day of October 2023.

*Robert S. Ballou*
_____
ROBERT S. BALLOU
UNITED STATES DISTRICT COURT JUDGE